IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| CHRISTINA WHITE, | ) | Case No. 1:24-cv-1006 |
| | ) | |
| Plaintiff, | ) | JUDGE BENITA Y. PEARSON |
| | ) | |
| v. | ) | MAGISTRATE JUDGE |
| | ) | REUBEN J. SHEPERD |
| COMMISSIONER OF | ) | |
| SOCIAL SECURITY, | ) | |
| | ) | **REPORT AND RECOMMENDATION** |
| Defendant. | ) | |

## I.  Introduction

Plaintiff, Christina White ("White"), seeks judicial review of the final decision of the Commissioner of Social Security, denying her applications for disability insurance benefits ("DIB") and supplemental security income ("SSI") under Titles II and XVI of the Social Security Act. This matter is before me pursuant to 42 U.S.C. §§ 405(g), 1383(c)(3), and Local Rule 72.2(b). Because the Administrative Law Judge ("ALJ") applied proper legal standards and reached a decision supported by substantial evidence, I recommend that the Commissioner's final decision denying White's applications for DIB and SSI be affirmed.

## II.  Procedural History

White filed for DIB and SSI on April 11, 2022, with a protected filing date of February 11, 2022, alleging a disability onset date of April 15, 2021. (Tr. 263, 267, 80-81). The claims were denied initially and on reconsideration. (Tr. 82-101, 104-21). She then requested a hearing before an ALJ. (Tr. 191-92). White (represented by counsel) and a vocational expert ("VE")

testified before the ALJ on April 26, 2023. (Tr. 38-75). On July 12, 2023, the ALJ issued a written decision finding White not disabled. (Tr. 12-37). The Appeals Council denied his request for review on May 7, 2024, making the hearing decision the final decision of the Commissioner. (Tr. 1-3; *see also* 20 C.F.R. §§ 404.955, 404.981). White timely filed this action on June 13, 2024. (ECF Doc. 1).

## III.    Evidence

### A.    Personal, Educational, and Vocational Evidence

White was 45 years old on the alleged onset date, making her a younger individual according to Agency regulations. (*See* Tr. 31). She graduated from high school. (*See id.*). In the past, she worked in food delivery. (Tr. 30).

### B.    Relevant Medical Evidence[1]

Prior her disability onset date, on September 13, 2020, White presented to the emergency department complaining of bilateral radiating low back pain. An examination determined the back pain was consistent with L5 radiculopathy. (Tr. 999). She was already on a significant number of pain medications, including Percocet and Toradol, without improvement. (*Id.*). Given her significant gait difficulty, an MRI was ordered with suspicion for herniated disk, lower lumbar region. (*Id.*). On September 14, 2020, the MRI of White's lumbar spine revealed multilevel degenerative changes, most pronounced at L4-L5 and L5-S1. (Tr. 1164-65). On reevaluation, White reported some improvement in her pain and an ability to ambulate at home

---

[1] Although White summarizes medical evidence relating to her mental health impairments (*see* ECF Doc. 8, pp. 7-12), she does not raise error with the ALJ's evaluation of these impairments (*see id.* at pp. 17-23). Instead, she raises error solely with the ALJ's evaluation of whether her knee impairments met Listings 1.17 or 1.18, and whether the ALJ improperly minimized her ability to use her hands. (*Id.*). I therefore limit my review of the medical evidence only to these issues and deem any argument as to her mental health impairments waived. *See McPherson v. Kelsey*, 125 F.3d 989 (6th Cir. 1997).

with a walker. (Tr. 999). She was initially provided a prescription for Medrol dose pack and Robaxin, but White reported anaphylactic shock to the Medrol, and no alternative steroid was found. (*Id.*). White was discharged with a prescription for Robaxin only. (*Id.*). At a physical therapy appointment on September 29, 2020, White reported her pain had improved from a 9/10 to a 7/10 with the new medication. (Tr. 997). She was no longer relying on her walker and had improved her walking ability with a straight cane. (*Id.*).

On December 10, 2020, White underwent bilateral medial branch block injections at L4, L5, and S1 with Chong Kim, M.D. (Tr. 977-78). She reported having pain of 9/10 that day. (Tr. 977). At follow up on December 23, 2020, with Ann Harrington, APRN-CNS, White reported continued pain, mechanical in nature, worse with bending, rolling over in bed, walking, sitting, and standing. (Tr. 970). The injections from December 10 provided no relief, nor did diclofenac or Robaxin; likewise, gabapentin 600 mg was "not really helping." (*Id.*). Ms. Harrington assessed her with morbid obesity (BMI over 50) with axial mechanical back pain 2/2 facet arthropathy, lumbar facet arthropathy, and left gluteus medius trigger point. (Tr. 973). She recommended White continue gabapentin to 600 mg, 8 daily, continue Celebrex twice daily, bilateral SI joint injection, with follow up after injection. (*Id.*). White received the recommended injections on January 14, 2021. (Tr. 969). At follow up, she reported about 50% ongoing relief, but that she still was in some pain, with some improvement in sleeping and walking. (Tr. 966).

On February 2, 2021, White presented to Christopher Bechtel, M.D. for assessment of degenerative joint disease of her left knee and post-traumatic osteoarthritis of her right knee. (Tr. 1393). During that visit, White reported that she had been suffering from chronic bilateral knee pain for "several years." (*Id.*). For the last six months, White had tried a combination of Tylenol, anti-inflammatories, activity modifications, weight loss, physical therapy, and intra-articular

3

injections of cortisone and viscosupplementation, but these interventions were no longer providing relief. (*Id.*). On examination, White had range of motion from 0-115 degrees with crepitus bilaterally, 5-7 degree fixed varus deformity on the right and 7-8 degree varus deformity on the left. (Tr. 1393-94). She had tenderness over the patella and over the medial and lateral joint line bilaterally. (Tr. 1394). Her strength was 5/5. (*Id.*). Radiographs of her bilateral knees demonstrated severe posttraumatic arthritis of the right knee with prior ACL construction hardware in place. (*Id.*). Dr. Bechtel advised White that she had exhausted conservative measures and she was a good candidate for total knee replacement, once she had lost five to ten pounds more. (*Id.*). Dr. Bechtel recommended follow up in two months for a weight check and further discussion of surgical options. (*Id.*). He recommended continuing to treat with Tylenol, NSAIDs, and low-impact exercises. (*Id.*). By her follow up appointment on April 6, 2021, White had lost a total of 85 pounds and Dr. Bechtel cleared her to plan for total knee replacement. (Tr. 1403).

On April 13, 2021, White met with Alison Myers, M.D., to establish care. (Tr. 443). She presented complaining of SI joint pain, treated with Toradol injections, and right arm tingling and numbness from the shoulder through all five fingers; it was intermittent but becoming more frequent. (Tr. 445-46). Dr. Myers ordered an x-ray of the cervical spine and noted she would refer White to neurology as necessary afterward. (Tr. 447). The x-ray, taken the same day, revealed possible traumatic injury at the right neck at C6-C7, and mild to moderate degenerative changes of the cervical spine, slightly increased since 2018. (Tr. 456). A neck CT or MRI was recommended for further evaluation. (*Id.*). A CT taken April 28, 2021 reported moderate to severe right C5-C6 foraminal stenosis. (Tr. 463-64).

After her alleged onset date, on April 29, 2021, White underwent a total right knee replacement. (Tr. 1345-48). Progress notes from April 30, 2021, note that White did well with therapy, was weightbearing as tolerated, and worked on climbing stairs. (Tr. 1350). White described having moderate knee pain, but notes indicated good pain control otherwise. (*Id.*). Occupational therapy notes indicate White had decreased balance, and decreased independence with transfers and self-care, and decreased endurance. (Tr. 1355). Even so, occupational therapist Reagan DeLuca anticipated safe discharge to prior level of living with appropriate home modifications such as a tub bench. (*Id.*). Physical therapy notes state that White reported a previous functional level of modified independent ambulation with a wheeled walker because of back pain. (Tr. 1359).

White attended a post-surgical follow up with Dr. Bechtel on May 19, 2021. (Tr. 1409). White reported having no weightbearing pain or pain with range of motion; her pain was much better than it was before the surgery, but at times could be 4/10. (*Id.*). She was taking sparing oxycodone and anti-inflammatories for pain. (*Id.*). The incision was healing well with minimal swelling or effusion. (*Id.*). Her range of motion was from 0-115 degrees and was stable to varus/valgus stress throughout the arc of motion. (*Id.*). The patella tracked well with no appreciable crepitus. (*Id.*). Dr. Bechtel recommended starting outpatient therapy and resuming activities as tolerated. (Tr. 1410). He began the process of weaning White from narcotics but provided one final prescription for oxycodone. (*Id.*). Dr. Bechtel recommended follow up in one month and discussing timing of her total left knee replacement at that visit. (*Id.*).

At follow up with Dr. Bechtel on June 15, 2021, White reported her pain was well controlled and she was progressing nicely with physical therapy. (Tr. 1421). She had 0-120 degrees range of motion, stable to varus and valgus stress, 5/5 strength, fully neurovascular

intact. (*Id.*). Dr. Bechtel recommended returning in six weeks for routine follow-up and x-rays. (*Id.*).

On July 9, 2021, White met with neurologist Catherine Mamah, M.D. for tingling in her fingers, feet, and toes. (Tr. 463). White reported that the tingling, neck pain, and numbness had started intermittently two years before, but had increased and was now occurring constantly. (*Id.*). Her back pain was being managed with lidocaine patches and Lyrica, but intermittent numbness and tingling in her feet had been causing balance problems. (*Id.*). On examination, Dr. Mamah noted asymmetric ankle-deep tendon reflexes. (Tr. 468). Her gait was steady. (*Id.*). Dr. Mamah ordered an EMG to evaluate for neuropathy and radiculopathy, as well as an MRI of the cervical spine to evaluate the earlier x-ray and CT findings. (*Id.*). She recommended White return to the neurology clinic in two months. (*Id.*).

On August 20, 2021, White met with Ms. Harrington for bilateral SI joint injections. (Tr. 479). Ms. Harrington noted the previous injections in January 2021 had provided 75% relief. (*Id.*). The right knee replacement may have aggravated her back symptoms. (*Id.*). On examination, her gait was limited and she was using a rollator walker. (Tr. 480). Ms. Harrington recommended continuing with the SI joint injections on an as-needed basis. (Tr. 480). White also was prescribed Mobic every day as needed. (*Id.*).

On September 10, 2021, Dr. Bechtel noted White had continued to make progress with outpatient physical therapy and had 0-120 degrees range of motion. (Tr. 1427). White denied any issues with the wound. (*Id.*). She reported mild pain and improvement compared to preoperative pain and symptoms. (*Id.*). X-rays revealed excellent positioning of the components with no evidence of fracture, loosening, or subsidence. (*Id.*). Dr. Bechtel recommended White continue with home stretching and exercise, progressing activities as tolerated. (Tr. 1428). He was pleased

with her early progress and noted that her symptoms would be expected to continue to improve for at least 6 to 12 months post-surgery. (*Id.*). Dr. Bechtel discussed planning for White's left knee replacement. (*Id.*). X-ray of the left knee from September 11, 2021, revealed severe lateral compartment osteoarthritis with moderate effusion and intra-articular body and genu valgum. (Tr. 1433-34).

On November 8, 2021, EMGs demonstrated bilateral median mononeuropathy at the wrist, consistent with carpal tunnel syndrome, chronic neuropathic changes, and findings approaching abnormal ranges on the right. (Tr. 579). In addition, there appeared chronic right cervical radiculopathy at C7 with some degree of C8 or T1 involvement. (*Id.*).

On January 28, 2022, White met with Ms. Harrington for bilateral SI joint injections. (Tr. 799). She again noted the right knee replacement seemed to have aggravated her back symptoms. (*Id.*). White also reported that she had not been taking her medications because of lack of funding but was back on Abilify and lidocaine patches as of the visit. (*Id.*). On examination, White had minimal edema in her bilateral lower extremities and her gait was "usual." (Tr. 800). Ms. Harrington recommended follow up in one month. (*Id.*).

On February 10, 2022, White met with neurologist Daniel Benson, M.D. for evaluation of her bilateral arm and hand pain. (Tr. 806). She reported a several year history of bilateral arm pain radiating from the upper shoulder to the first three digits of her hand, right greater than left. (*Id.*). She reported mild weakness in her hands, but her primary symptoms were tingling and pain. (*Id.*). She could provoke these symptoms by pressing on her wrist or neck, and she felt they had progressed since her EMG test. (*Id.*). She had not tried injections, splints/braces, or physical therapy for her hands. (*Id.*). She reported managing her lower back and leg pain for SI joint injections and was prescribed duloxetine but had not received it yet. (*Id.*). On examination, her

proximal upper extremities had full strength, but slight weakness distally; her bilateral lower extremities were diffusely 4/5 due mainly to back and knee pain. (Tr. 809). Sensation was decreased in median nerve distribution in her right hand; inconsistent sensory examination in her left hand; and positive Durkan's sign bilaterally. (Tr. 810). She could rise unassisted but had antalgic gait. (*Id.*). Dr. Benson assessed White with cervical radiculopathy, low back pain with bilateral sciatica and bilateral carpal tunnel syndrome. (*Id.*). Dr. Benson affirmed Spine Center and Orthopedic Hand service referrals made by Dr. Mamah. (Tr. 810-11). Dr. Benson also placed a referral for physical therapy and prescribed elastic bandages and wrist splints with follow up in six months. (Tr. 811).

On March 31, 2022, White underwent left total knee replacement with Dr. Bechtel without complication. (Tr. 1469). During post-surgical physical therapy on April 1, 2022, White had limited mobility because of dizziness, but range of motion was within former limits on the right and 0-90 degrees on the left; muscle testing was 4+/5 on the right and 3+/5 on the left. (Tr. 1284-85). She reported pain of 8/10 in her left knee, but had good stability and slow paced, reciprocating step gait later in the day. (Tr. 1289-92). On April 2, 2022, White reported pain of 10/10 with any movement, but pain level at rest as 5/10. (Tr. 1298). She was weightbearing as tolerated. (Tr. 1301). At discharge on April 2, 2022, White was recommended to continue to use a walker for the first one to two weeks and transition to a cane as she felt safe and comfortable. (Tr. 1256). She was to weight-bear as tolerated on the left and continue to ice and wear compression stockings to help with pain and swelling. (*Id.*).

On April 19, 2022, White attended her first post-surgical appointment with Dr. Bechtel. (Tr. 1686, 1473). She reported progress with physical therapy and her range of motion was 0-100 degrees. (*Id.*). She had moderate pain and was taking oxycodone when her pain was greater than

8

a 5/10. (*Id.*). X-rays showed well-positioned, well-fixed components in her left knee with no evidence of fracture, loosening, or subsidence. (*Id.*). Dr. Bechtel continued White on NSAIDs for four weeks and began weaning narcotics as tolerated. (*Id.*). He recommended routine follow up in six weeks. (*Id.*).

On May 31, 2022, Dr. Bechtel noted White had continued to make progress with outpatient physical therapy and had 0-120 degrees range of motion in her left knee. (Tr. 1681). White denied any issues with the wound. (*Id.*). She reported mild pain and improvement compared to preoperative pain and symptoms. (*Id.*). Dr. Bechtel recommended White continue with home stretching and exercise, progressing activities as tolerated. (*Id.*). He was pleased with her early progress and noted that her symptoms would be expected to continue to improve for at least 6 to 12 months post-surgery. (*Id.*). He recommended follow up in six months and obtaining bilateral knee x-rays at that time. (*Id.*).

### C. Medical Opinion Evidence

State agency medical reviewer Gerald Klyop, M.D., reviewed White's record at the initial level on June 3, 2022. (Tr. 87-89, 108-10). He determined her file had new and material changes — bilateral knee replacements – and did not adopt the prior medical findings from 2019. (Tr. 89). He noted at the time of review White reported being able to lift 10 pounds, walk 10 minutes, and sit for 15 minutes; she was currently using a walker for ambulation in the first two weeks post-surgery and would transfer to use of cane. (Tr. 87). He opined White could work consistent with a light exertional level but required additional limitations including avoiding hazards such as unprotected heights and never climbing ladders/ropes/scaffolds due to bilateral knee replacements. (Tr. 87-88). He did not include manipulative limitations. (*See id.*). Elizabeth Das, M.D., affirmed these findings on September 4, 2022, at the reconsideration level. (Tr. 108-10).

David Blech, MSN, AGNP-C, White's mental health provider, provided an opinion of mental and physical capacity for work on March 2, 2023. (Tr. 1841-44). In it, he stated she could lift and/or carry five pounds, and stand/walk for one to two hours in an eight-hour day due to anxiety, major depression, obesity, and cellulitis. (Tr. 1843). Sitting was not affected. (*Id.*). He opined she could frequently reach, push/pull and perform gross manipulation, and occasionally perform fine manipulation. (Tr. 1844). She had environmental restrictions including heights, moving machinery, temperature extremes, pulmonary irritants, and noise. (*Id.*). She had not been prescribed a cane or walker, but she needed to be able to alternate positions at will, as well as raise her legs to 45 degrees at will. (*Id.*). He provided examination records to support his findings. (Tr. 1845-60).

### D.     Administrative Hearing Evidence

White testified at a hearing before the ALJ on April 26, 2023. (Tr. 48). She testified that the primary reason for her inability to work was anxiety, particularly in "crowds" as small as two people. (Tr. 48-49). White also experiences symptoms of depression causing her to not shower, eat, or socialize with other people. (Tr. 54). She also has PTSD causing her difficulty falling and staying asleep and causing flashbacks two to three times per week. (Tr. 55-56).

She also testified to problems with back pain and numbness in her wrists. (Tr. 49). She was not comfortable standing, sitting, or walking. (Tr. 50). It was "better" for her back pain to lay down. (*Id.*). She rated her back pain as 6/10 most days, and periodically was severe enough to require a visit to the emergency department. (Tr. 51). She described the pain as sharp and shooting down both legs to her toes. (Tr. 50). She had received injections for the pain, but without relief. (Tr. 52). Her doctors recommended additional injections, but she had been unable to obtain them because of transportation issues. (*Id.*). As for her wrist numbness, it did not cause

her pain, but it caused her difficulty holding things, buttoning her pants, or tying her shoes. (Tr. 51-52).

White also had knee replacement surgeries in 2020 and 2021. (Tr. 53). Prior to her knee replacements, she used both a walker and a cane, depending on her pain levels. (*Id.*). Since her knee replacements, she still requires the use of a cane due to her back pain. (*Id.*). She switches cane use between both hands because of her hand numbness. (*Id.*).

White lived by herself in a first-floor apartment because climbing stairs is difficult for her. (Tr. 57). She has a driver's license but only sometimes drives because of wrist pain while using the steering wheel and sitting for long periods hurts her back. (*Id.*). She had attempted to return to work as a driver for 20 hours or less per week. (Tr. 57-58). She was limited by her pain from obtaining more hours. (Tr. 58).

She described difficulty in completing her daily chores because of pain and depression. (Tr. 59-60). It would take her about two days to finish her dishes, and doing her laundry sometimes took her a week to complete. (Tr. 60). She rarely did anything socially – once every two or three months she might go out with her son – and she mostly spent time with her dog. (*Id.*). She is able to walk her dog, but not far. (Tr. 63).

White drove for a cab company (Tr. 61-62) and a food delivery service. (Tr. 64). However, she had high anxiety from driving. (Tr. 65-66). She drove for these companies for about 20 hours per week. (*Id.*).

The VE then testified. He determined that White's past job would be classified by the DOT as a deliverer, food, DOT 299.477-010. SVP 2, medium as generally performed but light as actually performed. (Tr. 67).

The ALJ presented the following hypothetical: an individual who could perform light work, but was limited to standing and walking four out of eight hours; occasionally using ramps and stairs, but never using ladders, ropes, or scaffolds; could frequently stoop, occasionally crouch, but never kneel or crawl; restricted from hazards such as heights or machinery, and able to avoid ordinary hazards in a workplace; could understand, remember, and carry out simple instructions and perform routine tasks; could make simple work-related decisions, but not at a production-rate pace; was limited to no contact with the public, but could have occasional contact with coworkers. (Tr. 67-68). The VE responded that such an individual could not perform White's past work, but based on his experience, the individual could perform work as a marker, DOT 209.587-034, SVP 2, light, and 28,000 jobs in the national economy; garment sorter, DOT 222.687-014, SVP 2, light, and 11,500 jobs in the national economy; and laundry classifier, DOT 361.687-014, SVP 2, light, and 10,500 jobs in the national economy. (Tr. 68-69). The VE noted that he reduced the available job numbers to accommodate a sit-stand option, given that the hypothetical contemplated four hours of standing and walking. (*Id.*).

The ALJ presented a second hypothetical, with the same restrictions as in the first, but this individual would further be limited to frequent handling and fingering. (Tr. 69). The VE stated that the above-identified jobs could accommodate this restriction. (Tr. 69-70). The VE also testified that the same jobs would remain if an individual needed a cane only for ambulation (not balance). (Tr. 70). However, the use of a walker would be work preclusive. (Tr. 70-71). In addition, if the person needed to use a cane for balance, no light jobs would be available. (Tr. 73). Some sedentary jobs could be performed seated, making the need for a cane for balance not work-preclusive. (*Id.*). These jobs include final assembler, DOT 713.687-018, SVP 2, sedentary, and 15,000 jobs in the national economy; sorter, DOT 521.687-086, SVP 2, sedentary, and

12

23,000 jobs; printer, DOT 652.685-038, SVP 2, sedentary, and 10,000 jobs in the national economy. (*Id.*).

The ALJ also presented a hypothetical limiting the individual to occasional handling and fingering. (Tr. 71). The VE responded that such an individual would be unable to perform the identified jobs. (*Id.*). Likewise, if the individual were limited to sedentary work, the previous jobs would not be available, and he could not identify other sample jobs. (*Id.*).

The VE also testified that an individual who would be off task for at least 20% of the workday due to unrelenting pain or a need to get away from the people around them would not be able to work. (Tr. 71-72). In his experience, employers would tolerate up to 10% of time off-task; anything more would be work preclusive. (Tr. 72). Likewise, the need for additional unscheduled breaks would be work preclusive. (Tr. 74-75).

## IV.    The ALJ's Decision

On July 12, 2023, the ALJ issued the following decision:

1.    The claimant meets the insured status requirements of the Social Security Act through December 31, 2021 (E4D).

2.    The claimant has not engaged in substantial gainful activity since April 15, 2021, the alleged onset date (20 CFR 404.1571 *et seq.*, and 416.971 *et seq.*).

3.    The claimant has the following severe impairments: obesity, degenerative changes and osteoarthritis of bilateral knees, degenerative changes of cervical spine (including associated shoulder arthralgia) L4 radiculitis with degenerative changes and spondylosis of lumbar spine, bilateral hip osteoarthritis, carpal tunnel syndrome, attention deficit hyperactivity disorder, major depressive disorder/bipolar disorder, post-traumatic stress disorder and anxiety disorder (20 CFR 404.1520(c) and 416.920(c)).

4.    The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).

5.    After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform light work as

13

defined in 20 CFR 404.1567(b) and 416.967(b) except she can stand or walk four hours in an eight-hour day and sit six hours in an eight-hour day. She can occasionally climb ramps and stairs but can never climb ladders ropes or scaffolds. She can frequently stoop and occasionally crouch, but never kneel or crawl. She can frequently handle and finger. She is restricted from hazards such as heights and machinery but is able to avoid ordinary hazards in the workplace such as boxes on the floor, doors ajar, and approaching people and vehicles. She can understand, remember, and carry out simple instructions and perform routine tasks. She can make simple work-related decisions but not at a production rate pace. She should have no contact with the pub[l]ic, but she can have only occasionally contact with coworkers.

6. The claimant is unable to perform any past relevant work (20 CFR 404.1565 and 416.965).

7. The claimant was born on March 2, 1976 and was 45 years old, which is defined as a younger individual age 18-49, on the alleged disability onset date (20 CFR 404.1563 and 416.963).

8. The claimant has at least a high school education (20 CFR 404.1564 and 416.964).

9. Transferability of job skills is not an issue in this case because the claimant's past relevant work is unskilled (20 CFR 404.1568 and 416.968).

10. Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1569, 404.1569a, 416.969, and 416.969a).

11. The claimant has not been under a disability, as defined in the Social Security Act, from April 15, 2021, through the date of this decision (20 CFR 404.1520(g) and 416.920(g)).

(Tr. 18-32).

## V.    Law & Analysis

### A.    Standard for Disability

Social Security regulations outline a five-step process the ALJ must use to determine

whether a claimant is entitled to benefits:

1. whether the claimant is engaged in substantial gainful activity;

2. if not, whether the claimant has a severe impairment or combination of impairments;

14

3.     if so, whether that impairment, or combination of impairments, meets or equals any of the listings in 20 C.F.R. Part 404, Subpart P, Appendix 1;

4.     if not, whether the claimant can perform their past relevant work in light of his RFC; and

5.     if not, whether, based on the claimant's age, education, and work experience, they can perform other work found in the national economy.

20 C.F.R. § 404.1520(a)(4)(i)-(v); *Combs v. Comm'r of Soc. Sec.*, 459 F.3d 640, 642-43 (6th Cir. 2006). The Commissioner is obligated to produce evidence at Step Five, but the claimant bears the ultimate burden to produce sufficient evidence to prove they are disabled and, thus, entitled to benefits. 20 C.F.R. § 404.1512(a).

**B.     Standard of Review**

This Court reviews the Commissioner's final decision to determine if it is supported by substantial evidence and whether proper legal standards were applied. 42 U.S.C. § 405(g); *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007). However, the substantial evidence standard is not a high threshold for sufficiency. *Biestek v. Berryhill*, 587 U.S. 97, 103 (2019). "It means – and means only – 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Id.* quoting *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938). Even if a preponderance of the evidence supports the claimant's position, the Commissioner's decision cannot be overturned "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003).

Under this standard, the court cannot decide the facts anew, evaluate credibility, or re-weigh the evidence. *Id.* at 476. And "it is not necessary that this court agree with the Commissioner's finding," so long as it meets the substantial evidence standard. *Rogers*, 486 F.3d

at 241. This is so because the Commissioner enjoys a "zone of choice" within which to decide cases without court interference. *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986).

Even if substantial evidence supported the ALJ's decision, the court will not uphold that decision when the Commissioner failed to apply proper legal standards, unless the legal error was harmless. *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2006) ("[A] decision . . . will not be upheld [when] the SSA fails to follow its own regulations and that error prejudices a claimant on the merits or deprives the claimant of a substantial right."); *Rabbers v. Comm'r Soc. Sec. Admin.*, 582 F.3d 647, 654 (6th Cir. 2009) ("Generally, . . . we review decisions of administrative agencies for harmless error."). Furthermore, this Court will not uphold a decision when the Commissioner's reasoning does "not build an accurate and logical bridge between the evidence and the result." *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011). Requiring an accurate and logical bridge ensures that a claimant and the reviewing court will understand the ALJ's reasoning, because "[i]f relevant evidence is not mentioned, the court cannot determine if it was discounted or merely overlooked." *Shrader v. Astrue*, No. 11-13000, 2012 WL 5383120, at *6 (E.D. Mich. Nov. 1, 2012); *see also Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 749 (6th Cir. 2007).

## VI.   Discussion

White brings two issues for this Court's review: first, whether the ALJ erred in evaluating whether her knee impairments met Listings 1.17 or 1.18; and second, whether the ALJ improperly discredited her reports of symptoms regarding using her hands, resulting in an overestimate of her RFC. (ECF Doc. 8, p. 1). Although it does appear White has significant

impairments causing her pain and distress, I ultimately determine, for reasons outlined in detail below, that I must recommend the District Court affirm the ALJ's decision.

A.   **The ALJ did not err in evaluating whether White's knee impairments met Listings 1.17 and 1.18.**

White brings as her first issue that the ALJ's holding that her bilateral degenerative joint disease of the knees did not meet or equal Listings 1.17 or 1.18 was in error because "the ALJ . . . evaluat[ed] each knee in a vacuum, without consideration of the compounding effects []that both knees required replacement." (*Id.* at p. 17, citing Tr. 20). She also argues that the ALJ "failed to consider in evaluating the right knee impairment that the left knee impairment existed simultaneously, but was not subject to replacement until almost fourteen months after initial discussion of surgery." (*Id.* at p. 20, citing Tr. 19, 1393, 1247).

The Commissioner argues that "[t]he ALJ sufficiently considered both [Listings] 1.17 and 1.18 and reasonably concluded [White] did not meet either listing, given her unremarkable recovery from knee replacement surgery, her only temporary need for assistive devices, and her ability to walk her dog for exercise." (ECF Doc. 10, p. 6, citing Tr. 19-20, 1830). The Commissioner further reminds this Court that a plaintiff has the burden to demonstrate disability under the Listings at Step Three and asserts that White has not done so. (*Id.* at pp. 6-8).

At Step Three, a claimant has the burden to show that she has an impairment or combination of impairments that meets or medically equals the criteria of an impairment listed in 20 C.F.R. § 404, Subpart P, Appendix 1. *Foster v. Halter*, 279 F.3d 348, 354 (6th Cir. 2001); *see also* 20 C.F.R. § 404.1520(a)(4)(iii). If the ALJ determines a claimant meets all criteria for a listed impairment, she is disabled; otherwise, the evaluation proceeds to Step Four. 20 C.F.R. § 404.1520(d)-(e); *Bowen v. Yuckert*, 482 U.S. 137, 141 (1987). Meeting only a portion of a

listing is not enough; "[a] claimant must satisfy all of the criteria to meet the listing." *Rabbers v. Comm'r of SSA*, 582 F.3d 647, 653 (6th Cir. 2009).

When evaluating whether a claimant meets or equals a listed impairment, an ALJ must "actually evaluate the evidence, compare it to [the relevant Listing], and give an explained conclusion, in order to facilitate meaningful judicial review." *Reynolds v. Comm'r of Soc. Sec.*, 424 F. App'x 411, 416 (6th Cir. 2011). The ALJ "need not discuss listings that the [claimant] clearly does not meet, especially when the claimant does not raise the listing before the ALJ." *Sheeks v. Comm'r of Soc. Sec. Admin.*, 544 F. App'x 639, 641 (6th Cir. 2013). "If, however, the record raises a substantial question as to whether the claimant could qualify as disabled under a listing, the ALJ should discuss that listing." *Id.* at 641; *see also Reynolds*, 424 F. App'x at 415-16.

It is not enough for a claimant to show that the ALJ's decision leaves an open question about whether or not they satisfy a Listing. *Sheeks*, 544 F. App'x at 641-42. "A claimant must do more than point to evidence on which the ALJ could have based his finding to raise a 'substantial question' as to whether he satisfied a listing." *Smith-Johnson v. Comm'r of Soc. Sec.*, 579 F. App'x 426, 432 (6th Cir. 2014) quoting *Sheeks*, 544 F. App'x at 641-42. Rather, the claimant must show that the question raised "is a *substantial* one that justifies a remand." *Sheeks*, 544 F. App'x at 642 (emphasis in original). Thus, "the claimant must point to specific evidence that demonstrates he reasonably could meet or equal every requirement of the listing." *Id.*

To meet the criteria of Listing 1.17, White must show three things:

(1) A history of reconstructive surgery of a major weight-bearing joint;

(2) An impairment-related physical limitation of musculoskeletal functioning that has lasted, or is expected to last, for a continuous period of at least 12 months; and

(3) A documented medical need for a walker, bilateral canes, or bilateral crutches or a wheeled and seated mobility device involving the use of both hands.

18

20 C.F.R. Pt. 404, Subpart P, App'x 1, § 1.17.

As for Listing 1.18, analyzing abnormality of a major joint in any extremity, it requires:

(A) Chronic joint pain or stiffness; and

(B) Abnormal motion, instability, or immobility of the affected joint(s); and

(C) Anatomical abnormality of the affected joint(s) noted on

(1) Physical examination (for example, subluxation, contracture, or bony or fibrous ankylosis) or

(2) Imaging (for example, joint space narrowing, bony destruction, or ankylosis or arthrodesis of the affected joint); and

(D) Impairment-related physical limitation of musculoskeletal functioning that has lasted, or is expected to last, for a continuous period of at least 12 months and medical documentation of at least one of the following:

(1) A documented medical need (see 1.00C6a) for a walker, bilateral canes, or bilateral crutches (see 1.00C6d) or a wheeled and sealed mobility device involving the use of both hands (see 1.00C6e(i)); or

(2) An inability to use one upper extremity to independently initiate, sustain, and complete work-related activities involving fine and gross movements (see 1.00E4), and a documented medical need (see 1.00C6a) for a one-handed, hand-held assisted device (see 1.00C6d) that requires the use of the other upper extremity or a wheeled and seated mobility device involving the use of one hand (see 1.00C6e(ii)); or

(3) An inability to use both upper extremities to the extent that neither can be used to independently initiate, sustain, and complete work-related activities involving fine and gross movements (see 1.00E4).

20 C.F.R. § Pt. 404, Subpt. P. App. 1 § 1.18.


The ALJ found that none of White's impairments, whether independently or in combination, met or medically equaled the requirements of these Listings. (Tr. 19-20). The ALJ provided the following analysis of Listings 1.17 and 1.18:

In addition, the evidence showed the claimant did have osteoarthritis in both knees and underwent total knee replacement on both knees. She was told she needed to temporarily use a wheeled walker and then used a cane. However, within a year,

the claimant's functioning improved, and she no longer needed to use a wheeled walker or cane for ambulation. The examinations of the claimant's knees post-surgery showed good range of motion. She did not have varus or valgus on stress testing. The x-ray of her knees post-surgery were unremarkable. The hardware was intact. Furthermore, the claimant was walking her dog for exercise. As such, the claimant's knees did not meet the listing for section 1.18 or 1.17.

(Tr. 19-20). Elsewhere in the decision, the ALJ considered White's knee impairments and

described them as follows:

The evidence showed the claimant had surgery on her knees that improved her knee pain. In February 2021, the claimant attended an orthopedic assessment of her knees. She had fixed deformity on the right valgus deformity on the left. She had tenderness over the patella. She had stable varus and valgus, anterior and posterior stress through range of motion. She had 5/5 muscle strength and no focal deficits. She had mild effusion bilaterally. She had x-rays of her right knee that showed severe post-traumatic arthritis of the right knee with prior ACL reconstruction hardware in place. She had severe joint space narrowing osteophyte formation, subchondral sclerosis, and subchondral cystic changes with various deformity. She had significant joint space narrowing, osteophyte formation, subchondral sclerosis. and cystic changes in the left knee. She had exhausted conservative measures and needed total knee replacement bilaterally. However, the orthopedic physician indicated that the claimant's right knee replacement would occur initially and subsequently have surgery on the left knee. In April 2021, the claimant underwent total knee replacement and using a walker and transition to cane until she could recover from surgery. In May 2021 the claimant was "doing well" and her right knee was progressing with physical therapy. She had good range of motion in her right knee. She had mild redness but no fever, chills, or systemic symptoms. She had no weight bearing pain or pain with range of motion. She was taking medication sparingly. On examination, the incision in her right knee was "well healing." She had small irritation of the skin with mild erythema. She had minimal swelling of the knee. She had good range of motion. She had good patella tracking. She had stable varus and valgus stress testing throughout the arc of motion. The x-ray of the right knee showed well positioned and well-fixed cementless-fit femoral and tibial total knee arthroscopic components with no evidence of loosening. The resurfaced patella was centered. She was told to start outpatient therapy. Two months later, June 2021, post right total knee surgery, the claimant's right knee was "doing well." She had good range of motion. She had stable varus and valgus stress testing. She had 5/5 muscle strength in her lower extremities. She had normal sensation to light touch.

. . .

At the orthopedic assessment in September 2021, the examination of the claimant's right knee showed she had mild pain. She had good range of motion and no

instability. She had 5/5 muscle strength in her right lower extremity. Her x-ray of her right knee was normal. The claimant was looking to undergo total knee replacement on her left knee.

. . .

Finally in March 2022, the claimant underwent left total knee replacement. In April 2022, the claimant's left knee was "healing well." She had good range of motion. Her knee was stable to varus and valgus stress. She had 5/5 muscle strength in the left lower extremity. Her x-ray of her left knee was unremarkable. and her patella was intact. In May 2022, the claimant was "doing well" with her left knee. She was told to continue with home stretching and exercise program. The claimant was told she did not need to return to orthopedic physician to assess her knees for six months. Nevertheless, the claimant did not return to the orthopedic physician for any assessment of her knees. Regardless, there was no evidence that the claimant continued to use an assistive device for standing or walking as asserted at the hearing.

(Tr. 22-25 (internal citation to the record omitted)).

I find no material errors in the ALJ's recitation of the facts here, and substantial evidence supports his findings that White does not meet *all* requirements of Listing 1.17 or 1.18.

Namely, with respect to Listing 1.17, White must show that, after her surgery (Listing 1.17(1)), she continued to have "[a]n impairment-related physical limitation of musculoskeletal functioning that has lasted, or is expected to last, for a continuous period of at least 12 months[.]" However, as the ALJ correctly notes, White improved post-surgery. (*Compare* Tr. 19-20, 22-25 *with* Tr. 1409-10, 1421 (status-post right knee replacement) *and* Tr. 1473, 1681, 1686 (status-post left knee replacement). It necessarily follows, therefore, that the impairment-related physical limitation resulting from the history of reconstructive surgery as required in Listing 1.17(2), did not last longer than 12 months for White. She therefore does not meet the requirements of this Listing.

Likewise, White does not meet the criteria of Listing 1.18. Although at portions of the record she is noted to be using a rollator, and at times she required the use of canes, White's

21

orthopedist, Dr. Bechtel, noted after each of her knee surgeries that it was expected for her to need these devices as she recovered, but they would not remain necessary as she regained strength and mobility. (*See, e.g.*, Tr. 1256, 1409-10, 1421, 1473, 1681, 1686). Thus, White does not meet Listing 1.18(D)'s requirement that she have impairment-related physical limitation of musculoskeletal functioning is expected to last a continuous period of at least 12 months and medical documentation of needing either a walker or a cane.

I therefore do not find reversible error with the ALJ's consideration of Listing 1.17 or 1.18 and recommend the District Court affirm.

**B.      The ALJ did not improperly overestimate White's Residual Functional Capacity.**

White next argues that the ALJ "improperly discredited [her] reports of symptoms, specifically with regard to using her hands, resulting in an overestimate of [her] residual functional capacity." (ECF Doc. 8, p. 10). White "testified to multiple symptoms that render her unable to sustain competitive employment, including: pain in her upper extremities, lower extremities and back, as well as limitation in the use of her hands due to numbness and tingling." (*Id.* at p. 20, citing to Tr. 49-52). The essence of White's argument is that the ALJ improperly limited her only to frequent use of her hands for handling and fingering, where, in her view, "This finding for frequent use of the hands is contradicted by both Ms. White and the objective evidence (exam, CT, x-ray, and EMG). Had the ALJ placed additional limitations, even just to occasional use of the hands for fingering/feeling, it would have required a finding of disability based on the Vocational Expert's testimony." (*Id.* at pp. 22-23, citing to Tr. 71).

The Commissioner states that substantial evidence – such as her conservative treatment, mild findings on examination, and her activities of daily living – supports the ALJ's finding that frequent handling and fingering was an appropriate restriction in White's RFC. (ECF Doc. 10, p.

22

8). Moreover, the Commissioner argues, this Court's review of subjective symptom statements is

deferential, and points out, for example, that White's own testimony was inconsistent. (*Id.* at p.

11 ("She testified both that handling a steering wheel hurt her wrists, but estimated that—during the

month of the hearing—she had also been able to drive about 20 hours a week for work." (Citing Tr.

57-58))). For these reasons, the Commissioner asserts that this Court should affirm; to do otherwise

would amount to a reweighing of the evidence. (ECF Doc. 10, pp. 9-12).

During the sequential evaluation process, an ALJ must identify the claimant's RFC,

which "is the most [the claimant] can still do despite [her] limitations." 20 C.F.R.

404.1545(a)(1). The RFC denotes "functional limitation and restrictions and . . . [the claimant's]

remaining capacities for work-related activities." SSR 96-08p, 1996 WL 374184, at *1. The ALJ

assesses "an individual's ability to do sustained work-related physical and mental activities in a

work setting on a regular and continuing basis." SSR 96-8p, 1996 WL 374184, *1. The ALJ

must "consider [the claimant's] ability to meet the physical, mental, sensory, and other

requirements of work." 20 C.F.R. 404154(b)(4); *see also Nejat v. Comm'r of Soc. Sec.*, 359 F.

App'x 574, 577 (6th Cir. 2009).

The RFC is an assessment of a claimant's ability to work despite his impairments. *Walton*

*v. Astrue*, 773 F. Supp. 2d 742, 747 (N.D. Ohio 2011), citing 20 C.F.R. § 404.1545(a)(1) ("Your

residual functional capacity is the most you can still do despite your limitations."). Relevant

evidence includes a claimant's medical history, medical signs, laboratory findings, and

statements about how the symptoms affect the claimant. 20 C.F.R. § 404.1529(a); *see also* SSR

96-8p. Although these are not adversarial proceedings, *Biestek v. Berryhill*, 587 U.S. 97, 99

(2019), and the ALJ serves as a neutral factfinder, *Sims v. Apfel*, 530 U.S. 103, 110-11 (2000), it

is not incumbent on the ALJ to advance the claimant's case. *Richardson v. Perales*, 402 U.S.

389, 410 (1971). Therefore, "while the ALJ must ensure that every claimant receives a full and

23

fair hearing, the ultimate burden of proving entitlement to benefits lies with the claimant." *Moats v. Comm'r of Soc. Sec.*, 42 F.4th 558, 563 (6th Cir. 2022), *cert. denied sub nom. Moats v. Kijakazi*, 143 S. Ct. 785 (2023) (internal citations and marks omitted).

Social Security Ruling 16-3p lists the factors relevant to the ALJ's determination of persuasiveness of a claimant's statements about "the intensity, persistence, and limiting effects of the symptoms on the individual's ability to do basic work activities." *Rogers v. Comm'r*, 486 F.3d 234, 247 (6th Cir. 2007). These factors include: the individual's daily activities; the location, duration, frequency, and intensity of the individual's pain or other symptoms; any medication the individual takes or has taken to alleviate pain or other symptoms; treatment, other than medication, the individual has received for relief of pain or other symptoms; any measures other than treatment the individual uses or has used to relieve pain; and, "[a]ny other factors concerning an individual's functional limitations and restrictions due to pain or other symptoms." SSR 16-3P, 2017 WL 5180304, at *7-*8; *see, e.g.*, *Morrison v. Comm'r*, No. 16-1360, 2017 WL 4278378, at *4 (6th Cir. Jan. 30, 2017). An ALJ need not expressly address all the factors listed in SSR 16-3p they but should sufficiently articulate the assessment of the evidence to assure the reviewing court that the ALJ considered all relevant evidence. *Cross v. Comm'r*, 373 F. Supp. 2d 724, 733 (N.D. Ohio 2005).

SSR 16-3p also instructs an ALJ how to consider a claimant's statements about intensity, persistence, or functional limiting effects of their symptoms in relation to treatment sought for those symptoms.

> [I]f the individual fails to follow prescribed treatment that might improve symptoms, we may find the alleged intensity and persistence of an individual's symptoms are inconsistent with the overall evidence of record. We will not find an individual's symptoms inconsistent with the evidence in the record on this basis without considering possible reasons he or she may not comply with treatment or seek treatment consistent with the degree of his or her complaints. We may need to

24

> contact the individual regarding the lack of treatment or, at an administrative proceeding, ask why he or she has not complied with or sought treatment in a manner consistent with his or her complaints.

SSR 16-3p at *9. "Attempts to obtain treatment may show that symptoms are intense and persistent; conversely, a lack of such efforts may show that an individual's symptoms are not intense or persistent." *Jill L. v. Comm'r of Soc. Sec.*, 2023 WL 4757601, at *7 (S.D. Ohio 2023), citing SSR 16-3p at *9. However, the ALJ "will not find an individual's symptoms inconsistent . . . on this basis without considering possible reasons he or she may not comply with treatment or seek treatment consistent with the degree of his or her complaints." SSR 16-3p at *9. An ALJ must consider these reasons "before drawing an adverse inference from the claimant's lack of medical treatment." *Dooley v. Comm'r of Soc. Sec.*, 656 F. App'x 113, 119 (6th Cir. 2016).

> Provided in part, the ALJ determined the following RFC:

> After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b) except . . . She can frequently handle and finger.

(Tr. 21). The ALJ supported his findings as follows:

> On July 9, 2021, the claimant attended a neurological assessment for numbness in her neck with some intermittent numbness in her right arm. . . . She had x-ray of her cervical spine that showed moderate to severe right C5-C6 foraminal stenosis (E2F). The examination of the claimant showed she had normal muscle strength, bulk and tone. She had normal flexion and extension that was 5/5. She had normal shoulder abduction, elbow flexion, extension wrist flexion and extension, finger flexion and extension and thumb abduction that was 5/5. . . . She had normal 2+ reflexes at the biceps, triceps, brachioradialis and patella. . . . The claimant was advised to have a nerve conduction study and MRI of her cervical spine. Then in November 2021, the claimant had a nerve conduction study that showed bilateral median mononeuropathy at the wrist, consistent with clinical diagnosis of carpal tunnel syndrome. The severity was mild by Nerve Conduction Velocity (NCV), but needle examination showed chronic neuropathic changes in bilateral Abductor Pollicis Brevis (APB) on the right side, the median motor Nerve Conduction Velocity (NCV) findings approach abnormal range. . . . There was chronic right cervical radiculopathy, probably at the C7 level (E2F/144, 152). However, she did not receive any treatment for her wrists or low back until the following year.

. . . Then in February 2022, the claimant attended a neurological assessment for her arm and hand with right worse then left. She had mild weakness of the hands but primarily tingling sensation and pain. She could provoke the symptoms by pressing on her wrist or neck. The examination of the claimant showed she had normal muscle bulk and tone. She had full strength in the proximal upper extremities. Distally she had slight weakness with superimposed giveaway in median, radial, and ulnar muscles bilaterally. . . . She had decreased sensation in the median nerve distribution in right hand, inconsistent sensory exam in left hand. . . . She was provided elastic bandages and wrist supports and told to attend physical therapy for neck and wrist pain (E6F/66). However, there was no evidence she attended physical therapy for her neck or wrists. Furthermore, in contrast to her assertion, the claimant used her hands for various tasks that she completed, including household chores, knitting, and moving to different residences, twice within a short time-period.

. . .

Despite any pain the claimant did perform activities during the day. The claimant drove to appointments. She would do household chores and enjoyed knitting. She would shop and attend appointments. She walked her dog for exercise. The claimant volunteered four to five days per week with the agency where she received her mental health treatment. In addition, she worked at least twenty hours per week as taxi driver. As such, the evidence supported the finding the claimant could perform light work as described herein.

(Tr. 23-25).

The ALJ concluded his RFC assessment by stating:

Based on the foregoing, the undersigned finds the claimant has the above residual functional capacity assessment, which is supported by the record as a whole. The evidence showed the claimant was obese and had pain in her back and knees that limited her ability to stand or walk four hours in an eight-hour day. In addition, she had pain in her neck and wrists. However, she only received conservative treatment for her back, neck, and wrists.

(Tr. 30).

With this review, I find no reason to reverse the ALJ's findings on the basis of White's bilateral upper extremities. As the ALJ properly notes, although White did have pain, numbness, and tingling, the treatment she received for this condition was conservative. While she likely was limited in her daily activities and could not enjoy them as she used to, she still was able to do activities such as driving for up to twenty hours per week. Furthermore, the ALJ did not fail to

consider limitations White might need because of her bilateral hand impairments – indeed, he included a limitation to frequent handling and fingering in the RFC. (Tr. 21).

I determine that White's assertion that she should have been limited "just to occasional use of [her] hands for fingering/feeling" (ECF Doc. 8, p. 23) is no more than an attempt to reweigh the evidence in her favor. This is an inappropriate use of this Court's review, and I decline White's invitation to reverse the Commissioner on this basis. Substantial evidence supports the Commissioner's decision that White is capable of work that incorporates a limitation for her extremities, even if White feels she should be more limited. It is not for this Court to determine the degree.

I again recommend the District Court affirm.

## VII.    Recommendation

Because the ALJ applied proper legal standards and reached a decision supported by substantial evidence, I recommend that the Commissioner's final decision denying White's applications for DIB and SSI be affirmed.

Dated: February 3, 2025

Reuben J. Sheperd
United States Magistrate Judge

---

## OBJECTIONS

### Objections, Review, and Appeal

Within 14 days after being served with a copy of this report and recommendation, a party may serve and file specific written objections to the proposed findings and recommendations of the magistrate judge. Rule 72(b)(2), Federal Rules of Civil Procedure; *see also* 28

27

U.S.C.§ 636(b)(1); Local Rule 72.3(b). Properly asserted objections shall be reviewed de novo by the assigned district judge.

* * *

Failure to file objections within the specified time may result in the forfeiture or waiver of the right to raise the issue on appeal either to the district judge or in a subsequent appeal to the United States Court of Appeals, depending on how or whether the party responds to the report and recommendation. *Berkshire v. Dahl*, 928 F.3d 520, 530 (6th Cir. 2019). Objections must be specific and not merely indicate a general objection to the entire report and recommendation; "a general objection has the same effect as would a failure to object." *Howard v. Sec'y of Health and Hum. Servs.*, 932 F.2d 505, 509 (6th Cir. 1991). Objections should focus on specific concerns and not merely restate the arguments in briefs submitted to the magistrate judge. "A reexamination of the exact same argument that was presented to the Magistrate Judge without specific objections 'wastes judicial resources rather than saving them, and runs contrary to the purpose of the Magistrates Act.'" *Overholt v. Green*, No. 1:17-CV-00186, 2018 WL 3018175, *2 (W.D. Ky. June 15, 2018) quoting *Howard*. The failure to assert specific objections may in rare cases be excused in the interest of justice. *See United States v. Wandahsega*, 924 F.3d 868, 878-79 (6th Cir. 2019).

Before